IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROCK CREEK LUMBER CO., INC.,          :
                                      :
        Plaintiff/Counterclaim        :     No. 3:08-CV-0967
        Defendant                     :
                                      :     Judge Sylvia H. Rambo
        v.                            :
                                      :
VALLEY MACHINE WORKS, LTD.;           :
PHOENIX MANUFACTURING                 :
SERVICES, INC.; CONCEPT               :
SYSTEMS, INC.; and USNR CORP.,        :
                                      :
        Defendants/Counterclaim       :
        Plaintiffs                    :
                                      :
        v.                            :
                                      :
GREG HATCHARD,                        :
                                      :
        Third-Party Defendant         :
                                      :

**M E M O R A N D U M**

Plaintiff Rock Creek Lumber Company, Inc. ("Rock Creek") brought
this negligence and breach of contract action arising out of its purchase of a custom-
built automated sawmill system called the Rock Creek Optimizer Linear Edger
("Linear Edger"), which was to be used to scan and edge hardwood lumber.  The
Linear Edger was purchased from Defendant Valley Machine Works, Ltd. ("Valley
Machine").  Currently before the court are separate motions for summary judgment,
(Docs. 78, 83), filed by Defendants Concept Systems, Inc., ("Concept"), and USNR
Corp., ("USNR"), two companies that entered into subcontracts with Valley
Machine to perform work on the Linear Edger.  The motions have been fully briefed
and are ripe for disposition.  For the reasons that follow, the court will grant in part
and deny in part Concept's and USNR's motions.

# I.  Background

## A.  Facts[1]

Rock Creek is a sawmill that is owed and operated by Donald Twining with a principal place of business in Thompson, Pennsylvania. On October 2, 2006, Rock Creek entered into a written contract with Valley Machine for the purchase of the Linear Edger. (Doc. 78-2, Linear Edger Contract.) This contract was negotiated through Defendant Phoenix Manufacturing Services, Inc., ("Phoenix"), although the record is not clear as to the precise role that Phoenix played in the negotiations or the subsequent trouble-shooting.

The contract included the sale of mechanical components, a programmable logic controller ("PLC"), a human machine interface ("HMI"), a linear scanner, a computer optimization system, and startup and installation support by a mechanical technician and PLC programmer. (*Id.*) The contract specifically called for an output of edged lumber at a rate of twenty four pieces per minute based on an average piece length of eleven inches. (*Id.*) The total cost of the system was $640,000. (*Id.*) Separately, the contract called for an additional payment of $28,000 for on-site start-up and technical help. (*Id.*)

Valley Machine designed, manufactured and supplied all of the mechanical components for the Linear Edger, including the lug chain, conveyors, saw box and motor for the saw box.[2] (Def. USNR's Statement of Material Facts

---

[1]The following facts are undisputed except where noted and are taken from the parties' statements of material facts which are supported by citations to the record.

[2]Plaintiff disputes that Valley Machine designed and manufactured all of the mechanical components and says simply that it does not know whether Valley Machine subcontracted any of the
(continued...)

2

("USNR's SMF") ¶ 4, Doc. 85.)  However, the more specialized components of the Liner Edger were subcontracted.  Specifically, Valley Machine subcontracted with USNR to provide the linear scanner and computer optimization equipment.  (*Id.* ¶ 5.)  Valley Machine subcontracted with Third-Party Defendant Greg Hatchard to provide the PLC hardware design and other hardware for the System.  (*Id.* ¶ 6.)  Finally, Valley Machine contracted with Concept to provide the software for the PLC and HMI systems, as well as the startup and training for the operation of the Linear Edger.  (Def. Concept's Statement of Material Facts ("Concept's SMF") ¶ 9, Doc. 80.)  This start-up subcontract was to be paid by Valley Machine to Concept from the $28,000 contracted for between Valley Machine and Rock Creek.  (*Id.* ¶ 10.)

   Thus, for the court's purposes, the Linear Edger contained three separate systems all of which were intended to work together: the mechanical system, which was designed and manufactured by Valley Machine; the optimization system, which was designed and supplied by USNR, and the controls or PLC system, which is the software that was written and installed by Concept.  Each of these systems was designed to work together.  Neither Concept nor USNR designed, selected, manufactured or supplied any of the hardware, including the PLC or HMI hardware.  (USNR SMF ¶ 9; Concept SMF ¶ 17.)

---

[2](...continued)

work.  (*See* Pl.'s Resp. in Opp'n to Def. USNR's SMF ¶ 4, Doc. 90.)  However, Plaintiff does not contest that Valley Machine was ultimately responsible for this work under the terms of the contract.  (*Id.*)  In any event, Plaintiff has come forward with no evidence suggesting that either USNR or Concept were subcontracted to design or build any of the mechanical components of the Linear Edger, and, thus any dispute about who actually performed this work is immaterial given that this memorandum concerns the disposition of USNR's and Concept's motions for summary judgment.

When operating, the mechanical components move the wood through the machine and make the cuts. The optimization components supplied by USNR were designed to scan the piece of wood and produce a three-dimensional image. (Dep. of Derek Daudrich at 44, Doc. 86-5 at 8 of 15.) The optimizer analyzes the image to determine the most efficient cut for each piece of wood and sends the data to the PLC through an ethernet cable. (*Id.* at 48, Doc. 86-5 at 9 of 14.) Lastly, Concept provided the software for the PLC system. This software is the language installed onto the PLC or HMI hardware for the operation of the system, and is designed to take the information provided by the optimization equipment and instruct the mechanical components of the Liner Edger how to move, positions the saws, and directs the machine to cut the wood. (*Id.* at 114, Doc. 86-5 at 11 of 14; Concept SMF ¶ 18.) Developing and installing programming languages, like those developed by Concept, typically requires special course work and training. (Concept SMF ¶ 21.)

The Linear Edger was installed and began operating in June 2007. Prior to and during the initial setup phases, representatives from Concept and USNR were at the Rock Creek sawmill to setup and program their respective components. USNR's employee Derek Daudrich was present at Rock Creek from May 21, 2007 through June 10, 2007, for the purpose of installing the optimizing equipment, testing communication between the optimizer and the PLC, and training the mill operators on the use of the optimizing equipment. (Report of D. Daudrich, Doc. 84-2 at 51 of 54.) Concept also had technicians at Rock Creek during this time. (*See* Aff. of Edwin Diehl ¶ 8, Doc. 78-5 at 3 of 75.)

From the beginning there were problems with the Linear Edger's performance. Specifically, it was never able to effectively edge twenty-four boards per minute as called for by the contract. When the USNR and Concept representatives left the Rock Creek mill in June 2007, the Linear Edger was operating at seven to eight boards per minute, which at the time was satisfactory to Rock Creek. (Dep. of Don Twining at 159, Doc. 84-2 at 37 of 54.) At some point, later in the summer of 2007, Rock Creek wanted to speed up the line to the twenty-four boards per minute called for in the contract. Representatives from both USNR and Concept came to the Rock Creek mill to attempt to make this happen, but they were not able to do so.

At his deposition, Don Twining testified that he learned that at least part of the problem with speeding up the line was a mechanical problem as opposed to an optimization or PLC problem. (*See id.* at 170, Doc. 84-2 at 39 of 54.) In fact, Twining specifically testified that he was not aware of any problems associated with either the USNR optimizer or the PLC in Rock Creek's failed effort to increase the the Linear Edger's output to twenty-four boards per minute:

> Q: Were you aware of any PLC control issues, software issues, as opposed to hardware issues?
> A: Not that I recollect.
> Q: Were you aware of any scanner issues with the USNR scanner?
> A: In reference to –
> Q: Speeding up the line?
> A: No. I'm not.

(*Id.* at 178:17-25, Doc. 84-2 at 41 of 54.) The Linear Edger never performed at the output rate contemplated by the contract.

Both Concept and USNR assert that they are owed money by Rock Creek. Concept asserts that it has not been paid for any of its work at Rock Creek

beyond the scope of the original subcontract with Valley Machine, and that it is owed $33,784.02. (Concept SMF ¶ 13.) USNR asserts that is has never been paid for any of its work invoiced directly to Rock Creek and that it is owed $31,344.09. (USNR SMF ¶ 7.) For its part, Rock Creek admits to having been invoiced these amounts and has not paid them, but contends that there are genuine issues of material fact concerning whether these amounts are owed because they are either duplicative of amounts that the Defendants received from Valley Machine or should not have been billed because they encompassed work that was performed in furtherance of the installation and startup of the Linear Edger. (*See* Pl.'s Resp. in Opp'n to Def. USNR's SMF ¶ 7, Doc. 90; Pl.'s Resp. in Opp'n to Concept's SMF ¶ 13, Doc. 86.)

## B. Procedural History

Rock Creek filed its Complaint on May 16, 2008. (Doc. 1.) The Complaint asserts claims against Valley Machine for breach of contract (Count I) and breach of warranty (Count II), claims against Phoenix for negligent misrepresentation (Count III), breach of contract (Count IV) and negligence (Count V), claims against Concept for negligence (Count VI), breach of contract (Count VII), and claims against USNR for negligence (Count VIII) and breach of contract (Count IX).

On July 18, 2008, USNR filed an answer with affirmative defenses and a counterclaim in response to Rock Creek's Complaint. (Doc. 14.) USNR's counterclaim seeks $31,344.08 for Rock Creek's alleged failure to pay for services and equipment provided by USNR. That same date, Concept filed an answer with affirmative defenses, a counterclaim against Rock Creek, and cross-claims against

Phoenix and Valley Machine. (Doc. 16.) Concept's counterclaim seeks $33,784.02 for work performed and materials supplied to Rock Creek by Concept which exceeded the scope of the work that Concept performed under its subcontract with Valley Machine.

On August 29, 2008, Phoenix filed an answer with affirmative defenses and a counterclaim against Rock Creek, as well as cross-claims against all Defendants. (Doc. 25.) On December 23, 2009, Rock Creek requested a default judgment against Valley Machine. (Doc. 39.) On December 29, 2008, the clerk of court entered a default judgment against Valley Machine. (Doc. 41.) On August 24, 2009, Concept filed a third-party complaint against Greg Hatchard. (Doc. 57.) After Hatchard failed to respond, default judgment was entered against him on March 2, 2010. (Doc. 74.)

By order of then-District Court Judge Vanaskie, all fact discovery was completed on December 31, 2009. (*See* Doc. 25.) The parties were required to file pre-trial disclosures by no later than April 15, 2010, which among other things were to list any expert witnesses to be used by the parties. (*See id.*) On April 13, 2010, Concept filed its pre-trial disclosure and listed its experts. (Doc. 75.) On April 15, 2010, USNR filed its pre-trial disclosure and listed its experts. (Doc. 76.) Rock Creek did not file a pre-trial disclosure and has not identified an expert witness as to causation, although it has disclosed to Defendants an expert report as to damages. (*See* Def. USNR's Br. in Supp. of Mot. for Summ. at 2, Doc. 84.)

On April 26, 2010, Concept filed its motion for summary judgment, brief in support, exhibits, and statement of material facts. (Doc. 78-80.) Rock Creek filed its response to Concept's statement of material facts on May 4, 2010,

(Doc. 86), and its brief in opposition to Concept's motion for summary judgment on May 5, 2010, (Doc. 89). Concept filed its reply brief on May 18, 2010. (Doc. 92.)

On April 30, 2010, USNR filed its motion for summary judgment, brief in support, and statement of material facts. (Docs. 83-85.) Rock Creek filed its response to USNR's statement of material facts and brief in opposition to that motion on May 14, 2010. (Docs. 90-91.) No reply brief was filed. On June 29, 2010, this case was assigned to the undersigned because of Judge Vanaskie's elevation to the United States Court of Appeals for the Third Circuit.

## II.      Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986). Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

Because subject matter jurisdiction in this case is based on diversity of citizenship, the court looks to the substantive law of Pennsylvania to determine the rights and obligations of the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938). The law of the Commonwealth is declared by "its Legislature in a statute or by its highest court." *Id*. The Pennsylvania Supreme Court is the best authority on Pennsylvania law, but when the Supreme Court has not issued a clear pronouncement in a particular area, the court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" to determine what the law is. *McKenna v. Ortho Pharm. Corp*., 622 F.2d 657, 661, 663 (3d Cir. 1980); *see also Comm'r v. Estate of Bosch*, 387 U.S.

456, 465 (1967). Opinions from lower Pennsylvania courts are not controlling, but they are entitled to significant weight when there is no indication that the Pennsylvania Supreme Court would rule otherwise.

## III. Discussion

### A. USNR's and Concept's Motions for Summary Judgment as to Rock Creek's claims

In its Complaint, Rock Creek asserts parallel negligence and breach of contract claims against Concept and USNR. As to Concept, Rock Creek alleges that it was negligent because it "failed to properly design, program, install and/or integrate the software which was integral to the proper operation of the [Linear Edger]." (Compl. ¶ 56, Doc. 1.) Rock Creek also alleges that Concept failed to "properly design, program, install and/or integrate the PLC which was integral to the proper operation of the [Linear Edger]." (*Id.* ¶ 57.) Rock Creek alleges that Concept is liable for breach of contract because it made attempts to correct the deficiencies in the programming but has been unable to do so, and that despite the Linear Edger's failure to adequately perform, it has invoiced Rock Creek for these services. (*See id.* ¶¶ 62-66.)

As to USNR, Rock Creek makes similar allegations. It alleges that USNR was negligent because it "designed, manufactured and sold" optimizer components which were "defective and/or not adequate for the purpose intended and misrepresented the capabilities of its component part to meet Plaintiff's requirements and specifications." (*Id.* ¶ 70.) Rock Creek further alleges that USNR failed "to properly supervise and oversee the proper installation and integration of the Optimizer System with the PLC." (*Id.* ¶ 71.) Finally, Rock Creek alleges that

USNR is liable for breach of contract because it made attempts to correct the deficiencies in the Linear Edger's performance but has been unable to do so, and that despite the Linear Edger's failure to adequately perform, it has invoiced Rock Creek for these services. (*See id.* ¶¶ 75-78.)

In their respective motions for summary judgment, USNR and Concept make the same arguments: Rock Creek's negligence and breach of contract claims fail because Rock Creek cannot identify competent evidence of the breach of a duty—either in tort or contract—and, even if it could, it cannot demonstrate that either USNR's or Concept's breach of their respective duties was the cause of the damages alleged by Rock Creek. The court will address each of these arguments in turn.

### 1. <u>Negligence</u>

To establish a prima facie negligence claim, Rock Creek must show that: (1) USNR and Concept had a duty to conform to a certain standard of conduct; (2) they breached that duty; (3) such breach caused the injury in question; and (4) that Rock Creek incurred actual loss or damage. *Krentz v. CONRAIL*, 910 A.2d 20, 27-28 (Pa. 2006) (*citing Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003)). Although they do not state so explicitly, USNR and Concept appear to concede that Rock Creek can establish that it incurred damages, thus satisfying the last element of the prima facie case.

However, both USNR and Concept argue that Rock Creek cannot produce evidence at trial demonstrating that either Defendant owed Rock Creek a duty, breached that duty, or that any breach caused the damages in question. Specifically, Defendants argue that expert testimony is required for Rock Creek to

prove that Defendants were negligent. Having reviewed the arguments and evidence submitted by the parties the court agrees with Defendants.

Both Concept and USNR have come forward with evidence strongly suggesting that the coordinated operation of the Linear Edger, specifically the operation of the PLC software and the optimization equipment, is far beyond the ken of the average lay person. For instance, Defendant Concept submitted its expert report which described the complicated nature of the Linear Edger:

> In a system such as the Rock Creek, Optimized Linear Edger, there are three separate systems that act as one. In this case, as others, there is the largest portion . . . the Mechanical . . . [which] was supplied by Valley [Machines]. The next biggest piece of the system is the Optimization, which in this case was supplied by USNR. Most customers have some preferences or passions for what Optimization "Name" they want in the mill, based usually upon their experience with a similar system within the mill. This would of course help with the sharing of proprietary spare parts. . . . [Which] generally consist of things like "Laser Scan Heads" and expensive "Laser Cameras" that are built by the Optimizer company and are not inter-changeable with other Optimizer companies' parts.
>
> . . .
>
> The third most significant and often overlooked part of the three system components, is the Controls System or the P.L.C. Although this system is somewhat obscure and unrecognized, it is in fact what makes the entire system work.
> . . .
>
> Unlike the Optimizer, much of the P.L.C. hardware is available to anyone that wants to buy it, and the structure and programming is what is often referred to as "open architecture." Simply put, this hardware can be programmed by anyone; however, the programming language is specialized. In other words, to make appropriate changes in this, the operator/technician would be required to have the specialized knowledge of the mechanics of the machine as well as the specialized

12

> knowledge of system flow and trouble-shooting, combined with the ability to speak the programming language.

(Report of Ken Appeldoorn, Doc. 78-6 at 5-6 of 15.) Additionally, Concept presented evidence that the PLC and HMI software are programmed with "symbolic, highly structured, specialized codes which provide precise instructions regarding computer operations." (Aff. of Edwin Diehl ¶ 18, Doc. 78-5) Likewise, Derek Daudrich, USNR's technician who installed the optimization equipment, and the individual identified by USNR as its expert, testified in his deposition about how the optimizer works:

> A.      It works off of kind of a reflection of a laser line, four laser lines. We scan the board. We take that data back. We then send that to the software, where its modelled [sic] into an image that the optimizer can use. And then the optimizer does the rest. It does it's fittings and comes up with the solution.
>                             . . .
>
> Q:      So it's USNR equipment that determines the length of the board. And with the length of the board and the modelling [sic] of the board using USNR software, USNR comes up with a solution for how to cut wane off the [board] in an advantageous way?
> A:      Correct.

(Dep. of D. Daudrich at 45:22-46:3, Doc. 86-5 at 8-9 of 14; *Id.* at 47:3-9, Doc. 86-5 at 9.)

Both excerpts illustrate the highly technical nature of the components installed by Concept and USNR, and it is the court's opinion that this is the sort of evidence that requires expert testimony. Under Pennsylvania law, like federal law, expert testimony is required in those situations where a layperson is not capable of evaluating whether a duty, assuming it exists, has been breached or the breach was the cause of the harm alleged. *See Jones v. Harrisburg Polyclinic Hosp.*, 437 A.2d

1134 (Pa. 1981). Thus, only where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons is expert testimony not warranted. *See id.* Such is not the case here. The court has little difficulty concluding that an understanding of the standards applicable to software design, installation, systems integration, and assessing whether they were performed with the standard of care of software engineers and systems integration specialists is outside the body of knowledge of the average lay person.

In its opposition to Defendants' summary judgment motions, Rock Creek argues that it does not need to produce expert testimony, and that to the extent that it does need to do so it has proffered the testimony of its owner Don Twining. As to the first issue, Rock Creek merely presents conclusory statements rather than arguments demonstrating why expert testimony is not needed. For example, in its brief, Rock Creek says that "Defendants had a duty to Rock Creek to perform their work in a good and workmanlike manner," and that it "believes both Defendants breached their respective duty in this regard. . . ." (Pl.'s Br. in Opp'n to Concept Sys.'s Mot. for Summ. J. at 7, Doc. 89.) These are conclusions, not arguments, and they beg obvious questions. For instance, why is it that Defendants had this duty? How is it that this duty was breached? From the evidence before the court, it is difficult for the court to see how either of these questions could be answered without the opinion of an expert in advanced saw mill technology, specifically linear edger systems.

Rock Creek next argues that to the extent an expert is needed, its owner Don Twining could testify in this capacity. Specifically, Rock Creek states that

Twining could testify about his experience with the Linear Edger, the mill's edging requirements, and his observations about the operation of the system and the appearance of the lumber as it exited the Linear Edger. This is not enough. No party disputes that the Linear Edger never produced a piece-per-minute rate that was satisfactory to Rock Creek and consistent with its contract with Valley Machine. Furthermore, no party contests that the Linear Edger damaged some of the wood that it was supposed to edge. However, Don Twining's observations about what the machine did, while helpful to Plaintiff's overall case, does not in and of itself establish that either Concept or USNR was negligent.

At this stage of the proceedings, Rock Creek must come forward with evidence from which a reasonable jury could conclude that either (or both) Concept and USNR were negligent. Given that the Linear Edger is a highly complicated piece of equipment, this requires Rock Creek to come forward with evidence concerning whether the optimization and PLC components were properly designed and installed, that they failed to work, and that the cause of the system's overall failure to work is attributable to the negligence of one or both of the Defendants. These are essential elements of Rock Creek's negligence claim, and Plaintiff has failed to produce this evidence. Accordingly, the court will grant summary judgment for both Defendants as to Plaintiff's negligence claims (Counts VI and VIII). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (stating that summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial.").

## 2. **Breach of Contract**

In counts seven and nine of its complaint, Rock Creek asserts that both Concept and USNR are liable for breach of contract due to the Linear Edger's failure to perform to expectation. Specifically, Rock Creek states that these Defendants failed to perform their services in a capable and competent manner and failed to remedy and correct defects in the system as they arose.

To establish a cause of action for breach of contract, the plaintiff must plead and prove (1) the existence of a contract to which the plaintiff and defendant were parties; (2) the essential terms of the contract; (3) a breach of the duty imposed by the contract and (4) that damages resulted from the breach. *See Halstead v. Motorcycle Safety Found., Inc*., 71 F. Supp. 2d 455, 458-59 (E.D. Pa. 1999); *Electron Energy Corp. v. Short*, 597 A.2d 175 (Pa. Super. 1991), *aff'd*, 618 A.2d 395 (Pa. 1993).

Even if Plaintiff were able to prove all of the other elements of its contract claim, Plaintiff has failed to produce competent evidence from which a jury could reasonably conclude that either Concept or USNR breached any duty imposed by the contract. Specifically, Plaintiff has produced no evidence linking either of these Defendants' work to the defects in the overall functioning of the machine. The fact that the Linear Edger did not work properly does not mean that Defendants breached any contractual duties. Like its negligence claim, Rock Creek must come forward with some evidence from which a jury could reasonably conclude that the failure of the system to operate as promised by Valley Machine was caused by Concept or USNR's breach of their respective duties (in contract or in tort) rather than the failure of some other component of the system. *See Warnick v. NMC-*

16

*Wollard, Inc.,* 512 F. Supp. 2d 318, 332 (W.D. Pa. 2007) ("At most, Plaintiffs'
partial identification of evidence merely narrows the field of possible tortfeasors [or
contractually liable parties]. Showing that a defendant's product was among several
products which *could* have caused the injury is simply too speculative to be
submitted to a jury.") (emphasis in original) (quotations omitted). Thus, like its
negligence claim, Rock Creek has produced insufficient evidence to allow a jury to
reach a principled inference that either Concept or USNR is liable for the harm
alleged. Summary judgment is therefore appropriate.

### B.    Defendants' Counterclaims

In addition to seeking summary judgment on Rock Creek's claims
against them, Concept and USNR also seek summary judgment on their respective
counterclaims against Rock Creek. Concept asserts that Rock Creek owes it
$33,784.02 for either breach of contract or unjust enrichment. Concept asserts that
Rock Creek agreed to pay for certain third party software supplied by Concept and
the services provided to install and trouble-shoot that software. In support of its
claim, Concept attached invoices and an affidavit from its Chief Executive Officer
Edwin Diehl. (*See* Aff. of Edwin Diehl ¶ 10, Doc. 78-5 and Exs. 5 and 6 thereto.)
For its part, USNR asserts that Rock Creek owes it $31,344.09 for the services that
it rendered. In support, USNR points to portions of Don Twining's deposition
where he admits that there are outstanding invoices due to USNR. (*See* Dep. of Don
Twining at 230:18-231:8, Doc. 84-2 at 48-49 of 54.)

Rock Creek admits that both parties invoiced it for the work performed
at the mill; however, it contends that there is a genuine issue of material fact
concerning whether any of the amounts invoiced were paid to either company by

Valley Machine.  In support, Rock Creek presents a series of e-mails that it obtained in discovery from Concept.  (*See* Doc. 86-6 at 14-22 of 22.)  One of those e-mails appears to be an exchange from employees of Concept indicating that Concept received a check from Valley Machine in the amount of $16,285.60 on or about May 17, 2007.  (Doc. 86-6 at 16 of 22.)  As to the amounts allegedly owed to USNR, Rock Creek asserts simply that there is a genuine issue of material fact concerning whether USNR also was paid by Valley and double-billed Rock Creek for the work.  (*See* Pl.'s Resp. in Opp'n to Def. USNR's SMF ¶ 7, Doc. 90.)

Based on the court's review of the documents submitted by the parties, the court concludes that there are genuine issues of material fact surrounding how much is owed by Rock Creek to either Concept or USNR, which preclude the entry of summary judgment on these counterclaims.  As to the claims asserted by Concept, Rock Creek has come forward with evidence calling into question the amount that is owed.  The court has no way of determining how the $16,285.60 received by Concept in May of 2007 was allocated.  While Concept would like the court to conclude that this money was for the Valley Machine subcontract rather than any work that it performed for Rock Creek independent of that contract, the court has insufficient information to make this determination.  Concept also argues that the court should not consider the e-mails submitted by Rock Creek because they are inadmissible hearsay.  While they are certainly hearsay, it is too early to tell whether they would be inadmissable at trial because they were apparently authored by Concept employees and, thus, could be party admissions.  Of course, the court is not in a position to conclude one way or the other at this point whether this evidence, as

presented, is admissible. Nonetheless, at this stage, it is sufficient to create a genuine issue of fact precluding the entry of summary judgment.

The court reaches the same conclusion about USNR's counterclaim. While Rock Creek presented little evidence rebutting USNR's contention that it is owed $31,344.09, the court concludes that the evidence presented by USNR in support of its contention is insufficient to carry its burden of demonstrating that the money is owed. USNR points to a section of Don Twining's deposition where he admits that this amount was invoiced and not paid, ostensibly because of the financial difficulties that Rock Creek was having. This admission, however, does not demonstrate that the money was actually owed. The deposition was not a colloquy of the elements of a breach of contract action where Twining admitted each of the essential elements of that claim. At best, the transcript reflects Twining's admission that the amounts were invoiced and unpaid. While he does say that the only reason for nonpayment was that he was "unable to pay it," this statement standing alone does not unequivocally establish that USNR is entitled to payment. (*See* Dep of Don Twining 231:3-8, Doc. 84-2 at 49 of 54.) Accordingly, the court finds that USNR has not come forward with sufficient evidence warranting summary judgment on its counterclaim.

**IV.**        <u>Conclusion</u>

       In accordance with the foregoing, the court finds that Defendants Concept's and USNR's respective motions for summary judgment (Docs. 78, 83), should be granted as to all claims brought by Rock Creek against these Defendants, and should be denied as to Concept's and USNR's counterclaims against Rock Creek. The court will issue an appropriate order.


                                           s/Sylvia H. Rambo
                                          United States District Judge

Dated:  July 21, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROCK CREEK LUMBER CO., INC.,   :
                        :
      **Plaintiff/Counterclaim**  :   **No. 3:08-CV-0967**
      **Defendant**             :
                        :   **Judge Sylvia H. Rambo**
      **v.**                 :
                        :
**VALLEY MACHINE WORKS, LTD.;** :
**PHOENIX MANUFACTURING**   :
**SERVICES, INC.; CONCEPT**     :
**SYSTEMS, INC.; and USNR CORP.,** :
                        :
      **Defendants/Counterclaim**  :
      **Plaintiffs**             :
                        :
      **v.**                 :
                        :
**GREG HATCHARD,**         :
                        :
      **Third-Party Defendant**   :
                        :

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS
HEREBY ORDERED THAT**:

     (1)     Defendant Concept Systems, Inc.'s motion for summary
judgment (Doc. 78) is **GRANTED IN PART AND DENIED IN PART** as follows:

          (a)  The motion is **GRANTED** as to Counts VI and VII of
Plaintiff Rock Creek Lumber Co., Inc.'s complaint, which consist
of all claims by Rock Creek Lumber Co., Inc. against Concept
Systems, Inc.;

          (b) The motion is **DENIED** as to Concept Systems, Inc.'s
counterclaim against Rock Creek Lumber Co., Inc.

(2)     Defendant USNR Corporation's motion for summary judgment, (Doc. 83), is **GRANTED IN PART AND DENIED IN PART**:

> (a) The motion is **GRANTED** as to Counts VIII and IX of Plaintiff Rock Creek Lumber Co., Inc.'s complaint, which consists of all claims by Rock Creek Lumber Co., Inc. against USNR Corporation ;
>
> (b) The motion is **DENIED** as to USNR Corporation's counterclaim against Rock Creek Lumber Co., Inc.

(3)     The Clerk of Court shall defer entry of judgment until after trial on the issues remaining in this case.

(4)     The court will issue a separate order setting forth the remaining case management deadlines and a trial schedule for the balance of the case.


s/Sylvia H. Rambo
United States District Judge

Dated: July 21, 2010.